Application of Edmond L. KYSER and Stephan B. Sears.

Appeal No. 78–574.

United States Court of Customs and Patent Appeals.

Dec. 7, 1978.

Rehearing Denied Jan. 25, 1979.

John P. Sutton, Limbach, Limbach & Sutton, San Francisco, Cal., attorneys of record, for appellants.

Joseph F. Nakamura, Washington, D.C., for the Commissioner of Patents, William H. Beha, Jr., Washington, D.C., of counsel.

Before MARKEY, Chief Judge, and RICH, BALDWIN, LANE, and MILLER, Judges.

MILLER, Judge.

This is an appeal from the Patent and Trademark Office Board of Appeals ("board") affirming the rejection under 35 U.S.C. § 103 of claims 1–4, 12–14, and 17–20 in application serial No. 489,985, filed July 19, 1974, for "Method and Apparatus for Recording With Writing Fluids and Drop Projection Means Therefor," which is a continuation-in-part of application serial No. 50,445, filed June 29, 1970.[1] We affirm.

*The Invention*

The invention relates to an ink jet printer in which alphanumeric characters are printed by an apparatus which ejects drops of ink. Figure 2 is illustrative:

FIG. 2

The apparatus includes an ink source, which feeds (through line 17) an ink chamber 33 ending in a nozzle 36, and means for ejecting a drop of ink from the chamber through the nozzle in response to an "asynchronous" signal.[2] Preferably the ink is ejected by means consisting of a crystal or piezoelectric plate 32 bonded to one wall 31 of the ink chamber; the plate contracts in re-

---

1. Now patent No. 3,946,398, issued March 23, 1976. The parent application was before this court in 75–530 (decided June 30, 1975) wherein we affirmed, in an unpublished opinion, the rejection of the claims there appealed under 35 U.S.C. § 102.

2. Appellants' specification describes "asynchronously" as producing an ink droplet only upon demand, rather than continuously. Lacking "a recurring or rhythmic period" is the way appellants put it in their brief.

sponse to a signal, deflecting the wall to reduce the size of the chamber, thus producing a drop of ink through the nozzle. One signal is required to produce one drop, and each signal produces a drop independent of any prior signals. A character is printed by providing a plurality of ink chambers and nozzles fed from a common ink source. Referring to Figure 4, below, each drop may be broken up into a series of smaller drops 46 and 47 by providing one or more dividers 45 at the orifice (34 in Fig. 2; 43 and 44 in Fig. 4) of the nozzle.

### FIG. 4

The following claims are exemplary:

1. In an ink-jet printer having an ink source feeding an ink chamber which opens to a nozzle directed to

a recording medium, and drive means for providing asynchronous electrical signals to drive the printer responsive to predetermined patterns, the improvement comprising means responsive to said electrical signals to displace a predetermined quantity of ink from said ink chamber, asynchronously upon receipt of each signal from said drive means, independent of all previous signals, with sufficient force to project a single droplet of ink to said recording medium in a substantially straight trajectory.

12. A printer as in Claim 1 wherein the nozzle is divided by a divider into a plurality of zones with parallel axes serving to divide the ink at the orifice into smaller droplets upon ejection, each zone oriented toward the recording medium, each of equal cross-sectional area, whereby upon electrical signal a plurality of droplets is ejected, one from each nozzle zone simultaneously, all such droplets

travelling substantially parallel trajectories towards a recording medium.

13. An ink jet printer for asynchronously recording droplets responsive to electrical signals comprising:

an ink source,

a plurality of ink chambers fed by the ink source,

a recording medium,

a plurality of nozzles each communicating with an associated ink chamber and directed to the recording medium,

drive means for providing electrical signals to drive the printer to eject droplets from the plurality of nozzles in predetermined patterns, a plurality of displacement means, each associated with an ink chamber and responsive to the drive means to suddenly reduce the volume in a desired ink chamber on call, whereby a single droplet of ink is ejected from the associated nozzle each time the drive means provides an electrical signal, independently of all previous signals.

17. A system as in Claim 15 wherein said variable curvature wall element consists of a reaction plate immediately confining the chamber and an electrically distortable polarized crystal having two faces, one bonded to said reaction plate at said broad wall, said crystal having electrical conductors on said faces, which voltage applied across the crystal between said faces reduces the dimension of one face to deflect the reaction plate into said chamber.

19. A system as in Claim 15 wherein the center of each outlet orifice is spaced apart less than 0.05 centimeters from next adjacent outlet.

### The Prior Art

Hansell[3] relates to an ink jet device which functions as an air brush or facsimile recorder. Figure 1 below is illustrative:

**3.** Patent No. 2,512,743, issued June 27, 1950.

Fig. 1.

HIGH FREQUENCY ELECTRIC WAVE SOURCE – MODULATED OR UNMODULATED

Hansell includes an ink source 14, which feeds (through 15) an ink chamber inside a cone-shaped container 1 ending in a nozzle 2 directed toward the recording sheet. Drive means 12 provides an electrical signal which is supplied (by 13) to a piezoelectric crystal 3 to produce mechanical vibrations in the crystal. These vibrations are transmitted to the ink where they form compression waves. As these waves travel down the cone they increase in magnitude (due to the decreasing cross-sectional area) until they are strong enough to force a drop of ink from the nozzle 2. The electrical signal consists of a high frequency signal, which is amplitude modulated to vary the magnitude of vibration of the crystal and, thereby, to vary the size of the ejected drop.

Hildenbrand et al. ("Hildenbrand")[4] discloses an ink jet printer which includes a ceramic crystal mounted on a brass diaphragm overlying an ink chamber. The crystal functions to squeeze out a single drop of ink in response to an energizing pulse supplied to it.

Green[5] discloses a multiple stylus printing head for an impact printer; also that the tip of each stylus may be provided with a plurality of ink outlets to print a plurality of small dots instead of one large dot.

Williamson[6] relates to an ink jet printer which includes an ink-filled barrel ending in a nozzle with a resonating rod immersed in the ink. In response to a signal, the rod expands, building up pressure inside the barrel and forcing the elliptically-shaped opening to flex to a more circular shape, thereby causing a drop of ink to fall onto the recording medium.

*The Board Opinion*

The board affirmed the examiner's rejection of claims 1–4 and 14 on Hansell, claims 13 and 20 on Williamson, claim 12 on Hildenbrand and Green, and claims 17–19 on Hildenbrand.

Regarding claims 1–4, the board said that the signals applied to modulate the high frequency signal in Hansell are asynchronous and independent electrical signals that

---

4. Patent No. 3,708,798, issued January 2, 1973. Hildenbrand was filed on December 23, 1971 (which is after the filing of the parent application); therefore, it is cited only against appealed claims 12 and 17–19. The remaining claims have the benefit of the parent's filing date under 35 U.S.C. § 120.

5. Patent No. 3,108,673, issued October 29, 1963.

6. Patent No. 3,452,360, issued June 24, 1969.

cause the displacement of a predetermined quantity of ink asynchronously; that neither the record nor the prior opinion of this court involving the parent application supports appellants' argument that it would have been unobvious to eject a single drop of ink with each signal. Regarding claim 14, the board noted that Hansell projects varying amounts of liquid as a function of the varying amplitude of the signals. It said that, although Green relates to impact printers, one skilled in the ink jet art would have turned to Green for the disclosed divider to modify the Hildenbrand ink jet nozzle, thus rendering claim 12 obvious. The board found that Williamson would have rendered claim 13 obvious, since it discloses that the ink drops ejected from a nozzle can be varied in number and recorded asynchronously; also claim 20 obvious, since the computer shown in Williamson of necessity comprises a decoder. Regarding claims 17–19, the board stated that these cannot obtain the benefit of the parent application's filing date, thereby avoiding the Hildenbrand reference, because the features specifically recited in them are not described in the parent.

## OPINION

*Claims 1–4 and 14*

■ Appellants argue that Hansell relates to a continuously operated jet sprayer actuated by supersonic waves, whereas their device is an ink jet printer which ejects single drops of ink, not continuously, in response to each signal; that the portions of Hansell relied upon by the board do not disclose anything but a device which continuously ejects ink when in operation; further, that citing Hansell to indicate a discontinuous operation is mere speculation, insufficient to defeat the claims. Appellants also argue that this court's prior opinion involving the parent application recognized that Hansell does not eject a single drop in response to a single signal as does appellants' device, but requires the buildup of many supersonic waves (from many signals) to eject one drop.

The solicitor's position is that Hansell states that white areas of a drawn image would remain unpainted, and that this is possible only if his recorder ejects drops aperiodically or asynchronously. The solicitor also observes that Hansell displaces a single drop of ink in response to each signal. He points out, correctly, that the statement in this court's earlier opinion referred to by appellants was mere dictum, there being no issue over whether Hansell could be operated asynchronously.

In response to an electrical signal, Hansell's crystal vibrates and, thereby, produces a compressional wave in the ink that displaces a quantity of ink from the ink chamber. The vibration of the crystal is in response to a signal applied to it.[7] Each drop of ink is said to be produced by one vibration of the crystal (and one compressional wave).

The signal supplied to Hansell's crystal is a carrier signal of predetermined frequency. The amplitude of the signal is modulated to vary the amplitude of vibration of the crystal which, in turn, varies the amplitude of the compressional wave and, consequently, the ink drop size. If the amplitude of the carrier signal were modulated to zero, no compressional wave or drop would be produced. It is clear that Hansell's device can operate to produce ink droplets noncontinuously or asynchronously.[8] Adoption of appellants' structure would have been an obvious matter of design choice. *Cf. In re Kuhle*, 526 F.2d 553 (CCPA 1975). Accordingly, we are persuaded that the board was correct in concluding that claims 1 and 14 would have been obvious from Hansell.[9]

---

7. Hansell's crystal is not required to "resonate" in order to vibrate, but only to obtain maximum efficiency.

8. Hansell's device could also be asynchronously operated by merely turning it on and off when a drop was desired.

9. Claims 2–4 are not argued independently of claim 1, from which they depend.

### Claim 12

Appellants assert that Green fails to disclose a divider in the nozzle as required by claim 12 and that it would not have been obvious to apply Green's teaching to modify the nozzle of Hildenbrand. Although Green relates to an impact printer, it is sufficiently analogous art for its teachings to be combined with those of Hildenbrand, an ink jet printer. *Cf. In re Ellis*, 476 F.2d 1370 (CCPA 1973). Green discloses that the tip of each stylus may be provided with a plurality of outlets, so that a plurality of small dots is printed rather than one large dot. Therefore, the board correctly sustained the rejection of claim 12 by concluding that appellants' plurality of "dividers" would have been obvious from modifying Hildenbrand's ink jet printer with Green's plurality of outlets.

### Claims 13 and 20

Appellants contend that Williamson does not teach asynchronous ejection of drops of ink on call in response to each signal independent of previous signals, but teaches a continuously ejecting nozzle that creates visible drops of ink by incremental buildup of small drops. As earlier pointed out, Williamson causes a drop of ink to be ejected through the nozzle by expansion of the rod to build up pressure inside the barrel. One drop is independently formed in response to each signal. Although Williamson operates at 500 to 2000 kilohertz, there is no indication that it *must* operate for any period of time to produce a stream of many drops (instead of one drop) or that each drop is dependent on previous signals. Since Williamson discloses that a drop is produced in response to a signal, one skilled in the art would have found it obvious to apply one signal each time a drop is required, *i. e.*, to produce the drops asynchronously. Claim 20 differs from claim 13 only in providing a decoder to generate alphanumeric characters, and such a decoder is taught by the computer in Williamson. Therefore, the

board properly sustained the rejection of claims 13 and 20.

### Claims 17–19

Appellants argue that Hildenbrand is not a proper reference, since the present specification is nothing more than an expanded disclosure of an example in the parent application; that claims 17–19, therefore, have support in the parent and are entitled to its effective filing date. The solicitor responds that these claims are not entitled to the parent's filing date, because the parent does not disclose the wall element components or the use of one polarized crystal as in claims 17 and 18, and does not teach a maximum character height to give the maximum nozzle spacing in claim 19.

Claim 17 (from which claim 18 depends) [10] calls for a variable curvature wall element consisting of a "reaction plate immediately confining the chamber and an electrically distortable polarized crystal" bonded to the reaction plate. A signal supplied to the crystal causes the crystal to contract and deflect the reaction plate into the chamber. Appellants' parent application shows a variable curvature wall element, but this consists of two crystals bonded together and has no reaction plate. The action of the two crystals together, one expanding, the other contracting, in response to a signal causes the variable curvature. Since it is clearly essential to have two crystals working together, we cannot accept appellants' argument that the wire placement is the only difference involved. Accordingly, we agree with the board that claims 17 and 18 cannot obtain the benefit of the parent's filing date under 35 U.S.C. § 120. *Cf. In re Lukach*, 442 F.2d 967, 58 CCPA 1233 (1971).[11] Nor can claim 19 do so. It calls for a maximum spacing between adjacent orifices of less than 0.05 centimeters, whereas appellants' parent application does not indicate any maximum or preferred

10. A rejection of claim 15, from which claims 17–19 depend, was reversed by the board.

11. Appellants do not question the rejection of claims 17–19 over Hildenbrand if they are not entitled to the benefit of the filing date of the parent application.

height for the printed letters and the corresponding spacing between the orifices.[12]

Therefore, we conclude that the board was correct in affirming the rejection of claims 17–19.

*Summary*

In view of the foregoing, the decision of the board affirming the rejection of claims 1–4, 12–14, and 17–20 is *affirmed.*

AFFIRMED.

---

12. We note that since allowed claim 15 was entitled to the parent's filing date, Hildenbrand was not available as a reference. Nevertheless, claims 17–19, which merely add limitations to claim 15, were properly rejected since they cannot obtain the benefit of the parent's filing date (due to the parent not disclosing these limitations) to avoid Hildenbrand.